# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 13, 2014

## IN RE: PAIGE A.F., ET AL.

**Appeal from the Juvenile Court for Anderson County**
**Nos. J-30462/130815; J-30463/130816; J-30464/130817    Brandon Fisher, Judge**

---

**No. E2014-00450-COA-R3-PT - Filed November 26, 2014**

---

The State of Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Joann P.F. ("Mother") and Gary A.M. ("Father") to the minor children, Paige A.F., Tristan J.A.M., and Gaige D.W.M. ("the Children"). After a trial, the Juvenile Court for Anderson County ("the Juvenile Court") terminated Mother's and Father's parental rights to the Children after finding that clear and convincing evidence was proven of grounds to terminate Mother's and Father's parental rights for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2) and for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3), and that clear and convincing evidence was proven that it was in the Children's best interest for Mother's and Father's parental rights to be terminated. Mother and Father appeal the termination of their parental rights to this Court. We find and hold that the evidence does not preponderate against the Juvenile Court's findings made by clear and convincing evidence, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Tara L. Chalos, Knoxville, Tennessee, for the appellant, Joann P.F.

Paul L. Sexton, Oak Ridge, Tennessee, for the appellant, Gary A.M.

Robert E. Cooper, Jr., Attorney General and Reporter; and Kathryn A. Baker, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

## OPINION

## Background

The Children were removed from the parents' home in July of 2012 upon allegations of a violation of the Juvenile Court's no contact order, which disallowed contact between Father and the Children, and allegations of domestic violence and substance abuse by the parents. The Juvenile Court adjudicated the Children dependent and neglected in September of 2012. DCS filed the petition seeking to terminate Mother's and Father's parental rights to the Children on June 12, 2013. The case was tried over several days in October, November, and December of 2013 with extensive evidence being presented to the Juvenile Court.

Winter Ford, a family service worker for DCS who handled the Children's case from July of 2012, when the Children came into State custody, until January of 2013, testified at trial. Ms. Ford testified that both Mother and Father were "very good about keeping in contact and calling and visiting with the children" during the time she worked on the case.

At the time Ms. Ford had the case, Mother and Father were living in a trailer, and Ms. Ford believed that they were living in the same residence at the time of trial. Ms. Ford never went in to the trailer where Mother and Father lived. She did not know how many bedrooms or bathrooms the trailer had, she only knew where it was located.

Ms. Ford testified that a permanency plan ("the Plan") was created for the Children in August of 2012. Ms. Ford testified that Mother and Father participated in the process of creating the Plan and asked questions about where they could receive services. The Plan required Father, among other things, to complete an A&D assessment and comply with all recommendations, attend NA/AA meetings, participate in anger management, and maintain stable housing and transportation. The Plan required Mother, among other things, to complete an A&D assessment and comply with all recommendations, have a medication management appointment, refrain from taking all medications not prescribed for her, provide a copy of all of her prescriptions to DCS, submit to pill counts, and maintain stable housing and transportation. Another permanency plan was created for the Children in February of 2013 and in addition to the responsibilities contained in the Plan, Mother and Father were required to participate in an extensive domestic violence program and put into practice skills learned in this program, among other things. A third permanency plan was created in August of 2013 that contained substantially similar requirements to the previous plans. Ms. Ford testified that she discussed with Mother and Father where "they could do their A&D assessment, Bradford, and things like that."

-2-

Ms. Ford testified that Mother began her A&D assessment and just needed therapy, but the only documentation Ms. Ford received about this was for August, not for September. Ms. Ford contacted the therapist and was told Mother had missed some dates. Father missed four appointments and had been discharged from his A&D. Ms. Ford spoke with Father and Father's counselor, and the counselor agreed to allow Father to come back and complete the A&D treatment.

Ms. Ford testified that Father had issues with alcohol that led to issues with domestic violence, and that Mother had issues with prescription drugs. Ms. Ford talked to Father about his issues with alcohol, and Father stated he did not have any issues with his using alcohol. Ms. Ford spoke with Mother about her issues with prescription drugs, and Mother denied that she had any issues with abusing prescription drugs. Ms. Ford could not recall drug testing Mother or Father, but she testified:

> There was a visitation towards the end of November in which Gaige was sick. The foster parent had taken him to the doctor; so he was not able to attend the visitation. [Mother] inquired about that when I pulled up without him in the car.

> Throughout the course of - - she was fine, seemed okay when the visit began; but, at the end of the visit, she seemed to be slurring her words a little bit and when we were putting the kids in the car, she asked me where Gaige was. I found that a little - - even though he hadn't been there for the whole two-hour visit.

Ms. Ford did not have the ability to drug test Mother at that time.

Ms. Ford testified about the issues the parents had with domestic violence stating:

> They discussed at length that there was a neighbor that had lived across the street and that they had let live with them for a while and that is who they said kept calling in the referral. I told them I didn't know anything about that, that was a CPS thing, and that the allegations were false.

Ms. Ford testified that Mother and Father both denied that there was domestic violence in the home.

Ms. Ford testified that DCS provided therapeutic visitation for the parents and the Children. Ms. Ford testified that "[t]here were some issues with [the parents] being late

-3-

and not bringing supplies [to the visitations], but then they would leave and go get the supplies they needed and come back for the visits." Ms. Ford testified that the supplies she spoke about included snacks that Mother and Father had been asked to provide for the Children to have during the three or four hour visit.

After the therapeutic visitation stopped, Ms. Ford supervised visitations. She stated that to the best of her knowledge Mother and Father went to every visit offered. Ms. Ford testified that there were a couple of times when Mother and Father were late for a visitation due to transportation issues, but that they would call and let Ms. Ford know they were running late. Ms. Ford stated that on those occasions, Mother and Father were approximately fifteen minutes late to the visitation, but they did show up. Ms. Ford testified that the visitations she supervised went well. Father was appropriate with the Children and showed affection during visitations, and the Children were excited to see Mother and were affectionate with her.

Mother had issues with transportation. Ms. Ford was asked what DCS did to assist Mother with transportation, and she stated that they allowed Mother's parents to come to visitations because they were Mother's transportation. DCS also scheduled the visits closer to Mother's parents' home where Mother was staying at the time.

Ms. Ford testified that when the Children first came into State custody:

> Tristan had a lot of behaviors at day care to the point that we were afraid he was going to get kicked out of the day care. He was very aggressive. At one point, he head[-]butted teachers and was in such a fit of rage that he rolled under the half-door and kicked a baby; not on purpose, but he was just in a fit of rage. Tristan and Paige both had some speech difficulties as well.

DCS put the Children in therapy to address their issues. By January of 2013 when her work on the case ended, Ms. Ford had seen improvements in Tristan's behavior.

Leigh Anne Goldstine, the clinical manager at Foothills Care, testified at trial. Ms. Goldstine explained that she supervises the staff at Foothills Care, provides their clinical training, and also takes cases herself. Ms. Goldstine worked with Mother and Father and became involved in the case before the Children were taken into State custody. Ms. Goldstine became involved when Child Protective Services ("CPS") made a request approximately a month or a month-and-a-half prior to the Children being taken into State custody for someone to work with the family to prevent the Children from coming into State custody due to domestic violence issues.

Mother had told Ms. Goldstine that there had been an incident when Father became intoxicated and threw a knife in the home, which left a gouge in the wall. Mother told Ms. Goldstine that "[t]here had been some argument between a man who was living in the home at the time and [Father], and from there, this verbal altercation turned physical." Mother also told Ms. Goldstine about another incident wherein Father had thrown Mother off the porch. Ms. Goldstine testified that Father's "description of that particular incident with throwing her off the porch was not something from his perspective he saw the same way as the mother did." Father told Ms. Goldstine "something along the ones of, 'That's not exactly the way it was', or something to that effect."

Ms. Goldstine testified that typically when children are taken into State custody their case would be closed, but a referral for therapeutic visitation was made, so Ms. Goldstine met with Mother and Father several times to discuss some of the issues they were having. Ms. Goldstine met with Mother and Father as a couple, and met with Mother alone "often on the pre-custody side . . . ." Although she also had conversations with Father alone, she had no formal sessions with Father alone. When Ms. Goldstine was asked if she found Father to be cooperative, she stated:

> It wasn't until after the children came into custody and I met with them at the DCS office prior to the visit where we discussed some of these issues and I found [Father] to be very open and forthright about what his issues were. He, you know, discussed - - he said he wasn't drinking at the time, but - - you know, that he had stopped doing that, but he understood that they had issues and problems in the relationship. He several times said how committed he was to making, you know, progress and changes in the relationship. . . . So, yes, he was cooperative.

Ms. Goldstine testified:

[Mother] told me that [Father] drank often and that when he drank, he would become violent.

In terms of the mother, there was pain pill usage, which she denied. But [Father] told me at a meeting where both parents were present that she needed to just tell the truth about the extent of the problem. He had said that, you know, she had a problem with that in the past and was still doing that.

At a visit that we had early on at the park, I had asked about their recent drug usage, and she had said that she hadn't used in awhile and he corrected her and said that she had used within the past few days from a pill that she had

gotten from her sister.

Ms. Goldstine testified that at that point Mother "just kind of walked off and wasn't going to address the issue."

Ms. Goldstine testified that on one visitation at the park Mother and Father showed up prior to the arrival of the Children, but had no food or drinks for the Children. Ms. Goldstine testified that she had told Mother and Father prior to the visit that they needed to provide snacks for the visit, which was scheduled to last for several hours. Ms. Goldstine asked what they planned to feed the Children during the visit, and Mother and Father left to go to a market that Ms. Goldstine could see from her location at the park. Mother and Father were gone for about twenty minutes and then returned to the park with food and drinks.

Ms. Goldstine was asked how the Children interacted with Mother and Father during visitations, and she stated:

> At that visit, they did both interact with them at the park, walked around, because the children - - that's a bigger park there at Claxton Park; so they were moving around and so forth.

> The next visits that we did, we did them at the Lovell Road Burger King in the morning time when nobody else is there. [Mother] usually sat over to the side in a separate booth from where the three children and the dad sat. He would encourage her and I would encourage her to come over and sit with them.

> When she did come over and sit, she often turned her back to the children and looked at the play structure and was generally not involved with the children. She was often very harsh with them, particularly with Paige, and that was something that I had seen earlier on in the pre-custody side of the case.

Ms. Goldstine testified that this behavior remained typical for Mother during visitations and stated:

> The dad was attentive to the children. He made sure that they had food. He would get something for them, asking what they wanted. They brought gifts for Paige's birthday and went through that process with her at one of the visits, and he was opening - - helping her to open toys and putting things together and playing with her - - . . . - - while [Mother] sat to the side.

-6-

Ms. Ford was asked if Mother always sat at another booth during visitations, and she stated:

> It wasn't all one way or all another. At times, she sat at the booth and [Father] or I would encourage her to come over. Other times, she would be at the booth and sit. You know, there was some distance there even when she was sitting at the table in terms of not interacting with the children. [Father] did most of the talking with them asking questions and feeding them food and doing things whether it was ketchup packets or dipping sauce or whatever. . . . I recall one occasion when she said that she was sitting over there because she was sick.

Ms. Ford testified that Mother responded appropriately at visits during reunion and departure times and stated: "[u]sually at the visits, reunion and departure behavior would consist of I love you's and hugs." Ms. Ford never observed Father being inappropriate with the Children.

Ms. Ford testified about a specific visit stating:

> And in the visit that we did at the park, that visit the parents had a job and they were supposed to go to it later on in the day. [Mother] asked about ending the visit early. This was the same visit where they had been there and left to go get food and drinks and then came back. She said that she wanted - - that they had to leave because they had to go to work and they couldn't miss their job and so forth.
>
> I told them that they knew when the visit was scheduled. You know, I asked when they had to go to work. They didn't have to go to work until later in the day after the visit was over. [Mother] said that she wanted to leave early because she wanted to go by the house and change clothes and those types of things. [Father] told her that he was staying, that he didn't need to go home and change clothes, that it was more important for him to be there and visit with the children and so they both stayed.

The last visit Ms. Goldstine supervised was on September 28, 2012 because Ms. Goldstine already had been in the home for a long period of time and the fiscal department would not fund services beyond the end of September. Ms. Goldstine testified that at that time Father reported that he no longer was drinking, but that Mother still was using pills, and Mother and Father still needed to address the domestic violence issues.

Ms. Goldstine further testified:

The children were having a lot of difficulty in the foster home. I went to a meeting at the day care because the children - - the boys, particularly Tristan, who is the middle child, was eating out of the garbage there at the day care, eating off the floor, would refuse to get up from the table.

Those were all things that I talked to the parents about as part of that same discussion about nutrition and that kind of thing because we talked about the fact that the children had trauma around food that predated them coming into custody and why it was important to make sure that they had items there and so forth.

Ms. Goldstine was asked what she meant by "trauma around food" and she stated:

That is a term that I would use. Typically, when we see children who are food hoarding, stuffing themselves, eating out of garbage cans and so forth, that is a pretty clear indicator that they have some trauma around food. By that, I just mean that maybe meals weren't prepared, that there wasn't stuff for them to eat. I know on one occasion, there was not food in the home and there was discussion about that among the children.

Ms. Goldstine was asked how she knew that there wasn't food in the home, and she stated:

Because [Mother] told me that there wasn't. . . . I think they were nearing the end of their food stamps for the month. You know, often times, that happens with families. When they get to the end of the period of time, they're very low on what they have left on their EBT card. The kids drank a lot of milk; so she was saving it for that kind of stuff. I know she was back and forth between her parents because they were helping with food and that kind of thing.

Ms. Goldstine was asked if she saw an evidence of food-related behaviors when the Children were in the home with Mother prior to being taken into State custody, and she stated:

I did not see evidence of any of the food hoarding or any of those types of behaviors other than asking to eat around mealtimes. That's not atypical because a lot of times those food hoarding behaviors and things don't surface until they're out of the home and placed in a foster home or placed with a relative or whatever.

Ms. Goldstine testified that the incident where Tristan had gone through the

-8-

garbage happened after the Children were in foster care. Ms. Goldstine did not personally observe any food hoarding behaviors by the Children. When questioned further, Ms. Goldstine stated:

> It wasn't a single incident and I'm sorry if I portrayed it that way. One of the things that the - - what the day care director said to me and then I followed up with the individual day care person that was serving his class is that it was something that they were seeing on a regular basis, picking up food off the floor, trying to eat off of other children's plates, not wanting to get up from the table when they were done, and eating out of the garbage.

> So it was a pattern of behavior. That's why I termed it "food hoarding". It wasn't a one-time event that somebody dropped a piece of chicken that he really liked on the floor and he kind of said, "Oh. Three-second rule", and ate it. It wasn't like that. It was a pattern of behavior. . . . It wasn't his dropped food. From what they told me, this was other food that had been dropped on the floor by other children and he was on the floor trying to get it. When they would finish lunch and put all of the discarded food in the trash bin, several times he had been found over there going over there trying to dig through the garbage. And I believe Gaige was involved in some of that behavior as well.

Ms. Goldstine was asked what difficulties the Children were having in the foster home, and she stated:

> There was a lot of acting out behavior similar to what was being seen in the day care. There was a period of time when Tristan heard a siren. There was a police car outside the day care because it's real close to here where there's a lot of police vehicles, and he became unhinged. He was ripping the curtains off the wall there. They were having an extremely difficult time being able to calm him. The day care was at the point of saying they may have to discharge him because of his extreme behaviors: the difficulty falling asleep, food hoarding, gorging and that kind of thing. Those behaviors were occurring in the foster home too.

Ms. Goldstine testified that she worked with Mother and Paige because:

> There was a lot of animosity in their relationship. [Mother] was very hash [sic] with her at times and dismissive with her. We talked about the relationship between [Mother's] past history of abuse and her current parenting methods and what was going on for her that kept her from being able to appropriately

nurture the children.

Ms. Goldstine explained that when she worked in the home she worked with Mother and the Children. Ms. Goldstine did not work with Father because Father was not in the home at that time. Ms. Goldstine testified that during that time the Children were having behavior issues. She stated:

> Paige had quite a bit of acting out behaviors. Tristan also demonstrated a lack of discipline. If he was told to do something, he would completely refuse and fall on the floor and scream and yell. Some of that would have been due to his age, but also there were parenting issues in terms of mother's ability to handle that.

Ms. Goldstine witnessed aggressive behavior by Tristan like throwing things, hitting, and kicking when he was in the parents' home. She also observed that Tristan's speech was "[v]ery delayed, difficult to understand . . . ." Ms. Goldstine stated that she also noticed developmental delays in Paige.

Ms. Goldstine notified DCS about the behavior issues the Children were having. She also had discussions with the Children's day care and talked to the foster parents about therapy. Ms. Goldstine was not aware of the Children ever being placed in therapy.

Ms. Goldstine was asked if Mother talked to her about domestic violence, and she stated:

> Paige actually brought up the issue in front of me and [Mother] tried to stop her from talking about it. We discussed it in the context of what was scary to the child, what kinds of things would daddy do that would cause her to be scared because she talked about the incident where dad had thrown mom off the porch and [Mother] had told her that she wasn't even around, that she was asleep for those two instances; but the child obviously wanted to talk about it and tell what had happened.

Ms. Goldstine further stated:

> According to the mother, [Paige] was there. At least on the incident where mom was thrown off the porch, she was there. She was apparently asleep in the back bedroom.
>
> Then there was another incident where the children were with her and

-10-

he had shown up at the grandparents' home. This was following the birthday visit that they had had where he had come to the home under the supervision of the grandfather who actually left with him to get a cake and apparently [Father] had gotten - - according to the mother, had stopped at the liquor store and gotten alcohol and then came back to the home.

One of the things I discussed with mother is why she allowed [Father] to be there while she knew he was drinking and the children were there. She said she didn't think he was going to do anything there, her parents were there. Then, later on that evening, I think he had come to the home and was screaming and yelling and then her parents came to get her and she went back to their home where he showed up there and a police report was filed.

Ms. Goldstine was asked about the cleanliness of the parents' home, and she stated:

The home was often cluttered and dirty. There was remnants of food on the floor and, often times, dirty dishes on the table and in the sink.

At the visit that we did the day that the children were removed, [Mother's] older son was here visiting and he said to me that in the time that he had been there that he was the one doing all of the food prep and feeding the children and those types of things because his mother was always doing something else, on the phone or whatnot.

There was a room in there off of the living room and off the kitchen that was the dining room and that room was extremely cluttered, piled floor to ceiling, with clothes and things. I asked [Mother] about that several times because, you know, that space could have been utilized and she did not work, but she said that she didn't have time to take care of that.

Ms. Goldstine testified that Mother would go back and forth to her parents' home. Ms. Goldstine was asked if she ever had seen Mother's parents' home, and she stated:

I did. The day I was testifying about that [Mother] said she didn't have food [so Ms. Goldstine got food from her own home to give to Mother] and we went to the home, it was extremely cluttered and extremely - - I mean, I would call it filthy.

[Mother] said to me that her sister moved in there and had her child there. There was another sister there who came out and talked to me and she's got some mental disabilities and right away started talking to me as I was putting the children in the car about her boyfriend and her sex life right in front of the children. I had not met her before and had just walked into the home.

When we walked in carrying the bags, [Mother's] mother came over to take the bags from us and inspected them and started to put things up and claim them as her own. [Mother] told her that those were not things for her and she said something to the effect of, "Well, you bring this over here. You've got all this food. You need to share."

I told her that the food was not for her, that she is a grown up and she can get her own food, but this was food that was designed to keep the children from being hungry.

She went through the bags again and said - - you know, there was a big package of meat, and she said, "Well, this isn't enough to feed us."

I said, "Well, it wasn't intended for you-all."

We went into the kitchen, there was no place to put anything down. The table in there was piled up to my head with dirty dishes and things. There were pans of - - I don't even know what had been in the pans, but they were moldy and the entire sink all the way around (indicating) had dirty dishes all over.

I sat on the couch at one point and the two - - they had several dogs that were coming over. I love animals, but these dogs were flea-ridden. I mean, the fleas were jumping all over me. I had asked them to please move the dogs. Her mother got frustrated with me, you know, dismissing that, "They're just animals."

I said, "Well, they're full of fleas."

The carpet was full of fleas, the couch was full of fleas. It was just an incredibly filthy place. The floor had food ground into it, food still that you could see and it had obviously not been cleaned.

[Mother] told me later when we left to go to the park, because I

-12-

mentioned to her how awful it was and that there were children in there living in this and that I would need to report this to DCS, and she said that the landlord had come over and seen the condition of the home and was very disturbed about what he saw.

[Mother's] mother, when we came back from the park, the disabled sister was in the kitchen washing dishes and the grandmother was making excuses to me as to why she couldn't do any of this, that she's disabled, and she can't wash dishes or do anything like that. . . . It wasn't an appropriate place for any child.

Ms. Goldstine was asked if Mother's house was in a similar condition to her parents' home, and Ms. Goldstine stated:

No. These conditions were much worse. At the mom's home, you might have some dirty dishes just like a family might - - you don't wash everything from the night before or whatever; but this was, I would suspect, weeks of dirty dishes. I mean, every available surface on the table, on the counter[-]tops was just piled with dirty dishes. And the floor, as I said, food everywhere. I doubt that it had been swept or vacuumed in a very long time.

[Mother] had told me that when she and [Father] had stayed there with the children that they had stayed in a back bedroom that was so cluttered. You know, they had all the children there. I told her then, "This is not a place suitable for children."

Ms. Goldstine was asked who was living in the house while she was working with Mother, and she stated:

The mother and the three children and then [Mother's older son] came for that visit. There was another gentleman who came over who lived across the road who had been there before that. Apparently, as the mother explained, there was a verbal and physical altercation that occurred with him and the dad; so he left the home. He was there one day when I came for a scheduled appointment. Mom was not there. He was there, he let me in the door and proceeded to show me all of his self-mutilating scars of years of cutting.

After they left, because his girlfriend came over too at one point and then they left, [Mother] told me that she suspected those were the people who had called in CPS. I asked her why did she have these people caring for her

-13-

children, somebody that had obvious mental health issues to the point where he spoke to me about it and I'm a complete stranger. The girlfriend, when she left, told me that if I wanted to know anything about what was going on in that home to call her. I informed her that she would need to contact Child Protective Services and speak with them because I wasn't at liberty to talk with her.

Ms. Goldstine was asked if the Children had witnessed the altercation between the gentleman and Father, and she stated:

I'm not sure to be honest. Again, Paige talked about things that had gone on in the home; so somehow she had knowledge of this stuff and whether it was from hearing her mother talk about it with other people or whatever, I mean, she obviously had some details. Like, she pointed out to me the gouge in the wall from the knife and talked about the railing out front that her dad had thrown her mother over. So she had knowledge of this kind of stuff. Again, I'm not sure how much of it she heard about it after the fact and was repeating it or she was actually witness to it.

But she did talk about her dad yelling, being verbally aggressive in the home, yelling at her mom, those types of things. It was clear to me that the children had been witness, ear, eye, somewhere, something like that to what was going on in the home. And she talked about her dad, you know, having alcohol and those kinds of things; so even at that young age, she was clear that there was stuff going on.

Ms. Goldstine testified that Paige was five years old at that time.

Ms. Goldstine was asked if she observed either parent under the influence when she was doing therapeutic visitation, and she stated:

Probably looking back, I wonder now whether or not some of the lack of emotion from [Mother] might have been from pain pill usage because a lot of times that will dull people out.

I know that at the visit that we did at the park, she didn't say that day that she had been using, but [Father] had said that she had taken a pain pill that her sister who lives with her parents had given her a few days before. I mean, again, some of that lack of emotion can often be due to being on pain pills, but I don't have any evidence or proof that that was actually the case.

-14-

Ms. Goldstine also was asked if she observed evidence of domestic violence, and she stated:

> Well, there was the gouge in the wall, the incident that mother had said, and dad was not in the home. But the times where he would call over and over again, there was another time where we went to the store and he called four or five times while we were over by the milk trying to get - - and she was juggling the three children and she kept answering the telephone and said it was him.
>
> I told her, "You need to hang the phone up because you can't balance all three of these children", they were beginning to run in the store and do whatever. That is certainly something that is indicative, that controlling type of behavior that we see in domestic violence situations where you have one partner who is over[-]controlling and demanding and calling all the time and checking up on them and, you know, if they don't answer the phone - - because that was one of the things that she said. I asked her what would happen if she didn't answer the phone, and she said, "If I don't answer, he'll just keep calling and calling anyway."

Helen Burleson, who was the DCS foster care worker for the Children at the time of trial, testified. Ms. Burleson began working on the Children's case in January of 2013. She visited the home where Mother and Father live on one occasion a few weeks prior to trial. Ms. Burleson testified that she went to the home to do a random drug screen on Mother. Ms. Burleson stated:

> The gentleman that opened the door - - there was no numbers listed, and I wasn't sure - - we weren't sure if we were in the right location. . . . So when the gentleman answered the door, I asked him was this 105 Blacksferry Road, and he confirmed that it was. And I said, "So this is the residence of [Mother]?" And he's like, "It is." And I said, "Is she home?" And he said, "Yes, she is. Hold on just a moment." And he shut the door, and as he's shutting the door, I heard [Mother's] voice. Four minutes later, four or five minutes later, he comes back out and states that [Mother] is not there, he thought she was there, that she had left to go to the grocery store with a friend, and she would be back in forty-five minutes to two hours.

Ms. Burleson was not able to contact Mother until the next day, and did not administer a drug screen at that time.

Ms. Burleson testified that she did drug screen Mother on several other occasions. On May 7, 2012 Mother tested positive for benzos, oxycodone, and marijuana. Ms. Burleson testified that Mother never has produced a prescription for benzos or oxycodone. On July 24, 2012 Mother tested positive for benzos, methadone, opiates, oxycodone, and marijuana. On February 1, 2013 Mother tested positive for benzos, opiates, methadone, oxycodone, and propoxyphene. Mother tested positive for methadone on April 16, 2013. A drug screen done on July 11, 2013 showed that Mother tested positive for oxycodone. A hair follicle test was done on Mother on September 12, 2013, approximately three weeks prior to trial, and Mother tested positive for oxycodone and extended opiates.

Ms. Burleson testified that Father told her he was doing odd jobs here and there including working for TVA on some construction, but that Father provided no proof of employment or of income. Mother also provided no proof of employment or income.

Ms. Burleson testified that Mother participated in the creation of the permanency plans and signed them. Father later told Ms. Burleson he was in agreement with the plans, but never signed them. Ms. Burleson discussed the plans with both Mother and Father, and Father told her he needed help getting domestic violence classes and parenting classes. Ms. Burleson researched the options for Father, DCS agreed to pay for Father's classes, and Ms. Burleson contacted Father to give him the details. The classes cost around twelve hundred dollars. Father initially attended the classes, but did not complete them. Ms. Burleson stated that there had been a misunderstanding and explained:

> They had told [Father], when he was attending, that there was an issue, that they were not receiving payment.
>
> So [Father] called me and told me that there was an issue, and that he was told that he could not return unless payment was forthcoming.
>
> So I got in touch with our fiscal department, and it was somehow a mis[-]communication from our fiscal department with the Child and Family. And I told [Father] that that had been worked out, that he needed to return to the class.

Father did not return to the class. Ms. Burleson got Father scheduled for another domestic violence class, but Father has not provided any proof of attending or completing this class.

Mother also told Ms. Burleson that she needed help getting domestic violence classes and told her that she already was taking parenting classes. Mother had an issue with transportation to her domestic violence classes, so Ms. Burleson arranged for ETHRA to pick

up Mother, take her to class, and then take her home after class. Mother told Ms. Burleson that she was attending AA and NA meetings, but has not provided any proof of her attendance. Ms. Burleson testified that neither Mother nor Father has provided proof of addressing their respective A & D assessment and recommendations. Also, neither parent has provided documentation that they have gotten the required mental health assessments.

Ms. Burleson testified that since she has had the case Mother has visited the Children consistently, but that Father's last visit was in July, over two months prior to trial. Ms. Burleson was asked if Mother and Father had provided proof of having reliable transportation, and she stated:

> They do not. Every single time they have attended a visit, it is mister - - [Mother's] father that brings them. They do not have a license. There's a DUI, I think in Kentucky, that [Father] needs to take care of, and I think [Mother] has some outstanding tickets. So both of them have to resolve those issues before they can get their driver's license.

Mother was incarcerated in June of 2013 on contempt of court. Father was arrested in March of 2013 for domestic violence. Ms. Burleson testified that she spoke to the parents about domestic violence in the home. Mother denied that there was domestic violence in the home. Ms. Burleson stated:

> [Mother] stated that there was no domestic violence in the home, that the only issue had been when the children came into custody that [Father] had pushed her off of a porch, but that we due to he had been drinking and the children had just been removed, and he was just beside himself. . . . [Father] stated that he did not push [Mother[ off the porch, that he usually is a very calm person, does not have issues with domestic violence, but that when he drinks, that he can become angry, but that he is normally not a very aggressive, angry person.

Ms. Burleson testified that one day when she was taking Paige to therapy Paige told her:

> that her father was mean and that her father was a drunk.

> And then one day she also stated that she had to watch the kids all day, because she couldn't wake her mother up. She stated that she kept trying to get her mother to wake up, and her mother wouldn't wake up. So she had to care for the children that day, and it scared her.

> On the last visit we were on, out of nowhere, Tristan just asked

[Mother] did she remember when she had a black circle under her eye. And Paige stated, "Yeah, Mom, do you remember when you had a black eye from where Daddy hit you in the face?" And [Mother] asked them where in the world that was coming from, stated that it was not nice to talk about that - - about their dad with him not being there, and that their dad loved them very much, and then changed the subject.

Ms. Burleson testified that neither Mother nor Father feels they have a problem with drugs or alcohol. Father told Ms. Burleson that he felt that he didn't have an issue with drinking. Ms. Burleson told Father that he still needed to attend AA meetings, and he told her he had no problem with that. When Mother tested positive for drug use, she denied taking the drugs. Ms. Burlson stated:

On one instance when she tested positive for oxycodone, she said that there was no way she could have tested positive for oxycodone, but she stated that she felt she knew why, that she had an old pill bottle that had some crushed-up like powder from an oxycodone pill, and she had placed the pill she had taken into that bottle, and that's probably how she tested positive for the oxycodone, that some of the dust from that pill got on the pill she did take.

Ms. Burleson testified that Mother and Father were living together at the time of trial. Ms. Burlson testified: "At the beginning [Mother] stated that she was going to - - she felt in order to get the children back, she would have to have [Father] leave the home. So [Father] would leave the home, but there - - he kept coming back to the home." Ms. Burleson had concerns about Mother's safety and around the end of July she talked to Mother about going to a shelter. Ms. Burleson stated:

[Mother] kept going back and forth saying that she was going to go, but that she needed to pack some boxes, get memorabilia like pictures that were very important to her over to her mother's home. She wanted to be able to do it, she stated, on friendly terms with [Father].

And then at the next visit, I asked her had she planned to go to the shelter. She stated that she still was in the process of packing and getting things out of the home.

The next visit she stated, no, that she and [Father] had spoken, and they had decided to work together to be able to get their children back as a family, that they were trying to fix up their trailer, paint the trailer, get the children's rooms ready. It is my understanding there was eight or nine other people

-18-

living in the home, and that either [Father] or [Mother] was going to kick the other ones out and get their home ready.

Ms. Burleson testified that the Children have been in a foster home since they came into custody. The foster household consists of the foster mother, foster father, and six other children in addition to the Children. The other six children were adopted by the foster parents. Ms. Burleson visits the foster home twice a month. Ms. Burleson stated:

They have a very nice home. The children have their rooms. The girls share a room. There is - - it's very clean. It's very neat. It's a very loving home. The - - there's a lot of space for the children to run and to play both inside and outside, and the home is adequate for those children.

Ms. Burleson thought that the foster home had five bedrooms and three bathrooms. She stated: "there's adequate space" for all of the children in the household.

Ms. Burleson testified that the Children have a "very strong relationship" with the foster parents and are "very bonded." She stated that one day when she was taking Paige to therapy that Paige asked if she was going to have to leave the foster home, and "she stated that she didn't want to hurt her birth mother's feelings, but that she wanted to remain there and live there with [the foster parents]." Ms. Burleson stated that the Children interact "[v]ery appropriately" with the other children in the foster household. Ms. Burleson stated: "There's the normal sibling squabble here and there, but they get along very well."

Ms. Burleson would not recommend that the Children be returned to Mother and Father. She stated that Mother and Father have not resolved their issues with domestic violence and drugs, and further stated: "The home where they live, even though I've not been inside, from the outside did not feel - - did not seem appropriate. The biggest issue, I would be too afraid for their safety." Ms. Burleson stated that there was garbage around the home, the window blinds were broken and torn, and when the gentleman answered the door the view of the portion of the house that she could see "was very cluttered and very unclean."

Ms. Burleson testified that the current child support obligation for the Children is one hundred dollars per month per child. The only time Ms. Burleson knew of this being paid was when [Mother's] father paid a hundred dollars in June or July. Ms. Burleson testified that DCS paid an electric bill for Mother and Father of around two hundred and thirty dollars.

Ms. Burleson testified that DCS filed its petition seeking to terminate Mother's and Father's parental rights on June 12, 2013, and both parents missed visits with the

Children on June 20, June 26, August 5, August 19, September 12, and September 26, 2013. Both parents also missed a visit scheduled for the day before trial. Mother attended a visit on August 22, 2013, but Father did not. Both parents visited on July 25, 2013. With regard to the July 25th visit, Ms. Burleson testified:

[Mother's] father is the one that always drives them to the visitation. He was not present, so I asked them how they got to the visit, and they stated they drove. And I asked them how they were able to drive with neither one of them having a driver's license, and they stated that they were not able to get a hold of me in time to cancel the visit, so they just drove. And I strongly suggested that they not do that again because of the legalities if they were to be pulled over.

Since the Children came into custody, neither parent has been allowed any unsupervised visitation.

Marty E.S. ("Foster Dad") testified that the Children have been in his home the entire time they have been in custody, which at the time of trial had been about fifteen months. Foster Dad's household consists of him, his wife, and their four adopted children, in addition to the Children. Foster Dad also has two biological children who are fifteen and twenty-four years old. The fifteen year old lives with his biological mother and visits Foster Dad on weekends about once a month and a half or so. Foster Dad explained that there are seven children in the foster parent's full-time household. The oldest of the children is twelve and the youngest is three. The foster parents' house has four bedrooms and two bathrooms. Foster Dad testified that the girls share a bedroom and the boys share bedrooms, but each child has his or her own bed.

Foster Dad was asked how the Children behaved when they first came to his home, and he stated: "they had a very abusive tone to them. They had a very aggravated, very acting out, violent of sorts, they - - towards one another and towards each other on a regular basis, [especially the two boys] fighting on a regular basis. . . . It looked like two grown men fighting."

The older boy was three when he came into custody and was not potty trained, and both boys were drinking from bottles. Foster Dad stated:

And Paige told us that the boys drunk bottles, and she would - - actually, that night she got them a bottle of milk and showed us what they had been - - what she had been doing for the - - for her brothers, which was going to the

-20-

refrigerator, getting milk and pouring it, so they could have bottles.

Foster Dad was asked what the Children were like at the time of trial, and he stated: "They sit at a table and eat with good table manners. And her now in school and doing good. And playful and loving and funny and run around the house getting into everything like normal kids do and - - ." He testified that the Children do not act out like they did at first. Foster Dad testified that Tristan still acts out occasionally, but he now understands that there are consequences, and he does not like to be in trouble.

Foster Dad testified that he and his wife love the Children, feel bonded to them, and want to adopt them should they become available for adoption. Foster Dad had no concerns about his ability to care for seven children financially or otherwise.

Foster Dad testified that around Christmas of 2012, Tristan had some issues in day care. Foster Dad stated:

> He had started lashing out and becoming violent with the day-care workers, and actually running and hitting hisself (sic) on - - head on the wall and flopping to the floor, taking his clothes off, tearing everything off the wall, tearing the blinds off the wall, biting the teacher to the point to where - - well, actually, I missed eleven days of work going and getting him at school before he got kicked out of preschool - - or day care. . . . And he has been isolated in rooms by himself. And at that time Gaige was at the same preschool with him, and they would tear off into a fight, and the teachers couldn't handle them. I still had to go get them.

Foster Dad's wife's mother volunteered to watch Tristan during the day when he was dismissed from day care. At the time of trial Tristan was back in a regular preschool. Foster Dad stated: "it's also a structured preschool too" that is "really, really helping him," and he is doing well there.

Mother testified at trial. She testified that she goes to Peninsula for medication management and at the time of trial was taking Neurontin for mood disorder and Trazodone for sleeping. Mother testified that in addition to taking medication for her bipolar disorder, she goes to therapy at Peninsula Lighthouse. Mother stated that the therapy initially was once a week, then was changed to every two weeks, and that recently she has been going once a month. This is the therapy that DCS helped to set up. Mother also stated that she was getting pain medication and muscle relaxers from her family doctor. Mother testified: "I need two new knees, I have fibromyalgia and arthritis, and that's pretty much it, and migraines." Mother was asked what was wrong with her knees, and she stated:

It's from a long time ago, back in 1994. Yeah, '94. I knocked one of my knee[-]caps out and have been having trouble with both my knees ever since. I had multiple surgeries on both of them. 1998 were my last operations, and ever - - about three or four years later, sure enough, they started acting up and giving out again. And my doctor had told me that by the time I was age forty, I was gonna need new knees.

Mother was asked about her positive drug screens and she testified that she disagreed with some of the drug screens. She stated: "On the methadone. I'm allergic to methadone. It is in my paperwork, in my files with doctors, with the pharmacy, with the hospitals. I do not take methadone." With regard to the oxycodone, Mother stated:

The oxycodone I did have, and I guess I had - - I use little pill cases. I took one, and it was from any - - other things. And like I had tested only positive for the oxycodone, which I took my Neurontin out of that, and I dumped it in my hand, and I know I kept my other prescriptions in that thing too, so . . . .

Mother stated that she had a prescription for the oxycodone. She also testified that her primary care doctor had prescribed hydrocodone and benzos for her.

Mother was asked about testing positive for marijuana, and she stated: "I visited a friend who had cancer. . . . I lit it for her, took a couple of hits and handed it to her. She was sick. She needed help. . . . It happened a couple of times when I'd visit her. I visit every month, every other month." Mother was asked if she thought it was okay to "take a couple of hits," and she stated: "No, I didn't. I knew it wasn't okay, and I didn't always hit it. Like I was just in the room with her." She also admitted that this happened while the Children were in foster care. Mother testified that she was diagnosed with bipolar disorder and anxiety, but denied being diagnosed with cannabis abuse.

Mother was asked how she and Father handled it when they had an argument, and she stated: "We'd put our kids to bed, and we'd discuss it in our bedroom." She denied arguing in front of the Children and stated:

No, ma'am, very - - if anything, we always, well, and looked at each and said, "Not now, the kids are in the room." We may have - - occasionally, may have said something to each other, but it was in no way violent or hurtful or demeaning to one another in any way.

Mother testified that after Father was asked to leave the home the Children "started having violent temper tantrums and outbursts, and they have never done that stuff before."

Mother denied that the incident on the porch ever happened. She stated: "They may have misunderstood what I said. I said the initial allegations that were brought to [Father] and I, when she knocked on our door, was that he threw me over the banister, and I have repeatedly told them that that never happened." Mother was asked why two witnesses who had testified at trial had stated that she told them the incident happened, and Mother stated: "I did not say that occurred. I never said it did occur. . . . Absolutely, because I never said he threw me off a banister." At another point during her testimony, Mother testified:

> he shoved me on the deck. I was standing on the deck - - well, porch. And while we were both standing on it he just shoved me, but I didn't go off of it. I never went over the railing. I never went down any stairs or anything. He was on the deck, and he just shoved me.

Mother admitted that there was an incident prior to the Children being taken into custody:

> where [Father] had thrown a knife at the wall. The kids were in bed. It was a regular little knife. He was venting. Me and him were talking about what was going on with DCS, and he happened to have a steak knife in his hand, and he threw it at the wall.

Mother stated that she was standing away from the wall at which Father threw the knife. Mother then was asked how this was domestic violence, and she stated: "Arguing, yelling, and screaming at each other, that's the domestic violence that I was talking - - ."

Mother denied that the Children ever witnessed any domestic violence. Mother was asked how the Children knew about domestic violence, and she stated that they had overheard it being talked about or had been told by the CPS investigator. Mother was asked why a CPS investigator or a therapist might want to fabricate stories about domestic violence and tell them to the Children, and she stated: "I didn't understand it either. I said, "We've been being treated unfair from the beginning."

Mother was asked if she was living with Father, and she stated: "on occasion we stay together still." Mother testified that they were separated when the no-contact order was in place, and admitted that she had stipulated that they violated this order. Mother stated:

> What had happened was, the van had broken down. I let my neighbor know that if he seen [Father] to let him know the van had broke down. He did. [Father] was on his way back to wherever he was staying and had stopped by

-23-

to get the key. And I said, "No." I said, "You need to get off the property and leave right now." I said, "This is a violation. You need to leave right now or I will have to call the law. I'm not going to mess this up." And he said, "Yeah, I'm sorry." And he got back in the car and he left immediately. And that was the only time the no-contact order was broken.

The parties stipulated that Mother completed parenting classes. Mother testified that she took domestic violence classes, and stated:

I learned that I should not - - a form of domestic violence is also verbal abuse, being called names and being belittled - - belittled is the word she used. I learned that I don't have to take it, and that it is for me to remove myself from the violence, because nobody can do it for me. . . . I learned quite a lot. I learned how to explain to my children, you know, what - - name calling is a form of abuse, how to explain it to them if they ever asked any questions. So yes, I did learn. I learned how to communicate with the children on the child's level since they don't think the way we do, and stuff like that. I just - - I don't know how to put it into words. . . . I've learned not to start fights because it is not only me, you know. I could start a fight - - or even if it was him to start a fight, but I learned to walk away and take a break. And I learned that - - to keep violence out of the home, to sit and have a discussion, not to argue in bed. It's better to get up and talk about it, which - - sit at a kitchen table or something, you know, and talk about it instead of argue about it to flare each other's tempers, which I've applied with him. We are able to talk now instead of yell and scream at each other.

Mother testified that she and Father are doing better now. She stated: "if [Father] feels he's going to get angry, he will go to another room and calm down, and then he'll come out when he's ready to talk. And he'll be, like, okay. Let's discuss this in a calm fashion. And we do." Mother testified that the last big argument she and Father had was in February, when she had Father arrested.

Mother's testimony at trial occurred on two different days. On the second day of her testimony, Mother was asked if she remembered her testimony on the first day about never having domestic violence in the home, and she stated: "I honestly don't remember. I was just - - that day was - - I had a panic attack. I really don't remember." Mother again was asked if there had been incidences of domestic violence since she and Father had been together, and she stated: "Yes. . . . A total - - maybe three times." She stated that the incidences were after the Children were taken into custody and that one was in September of 2012, one in February of 2013, and another in June of 2013. Mother then stated that

"there was no physical - - or anything.  It was verbal."  Mother insisted that "[a]ll the domestic violence happened after the children were removed from the home."

Mother was asked what the September 2012 incident was about, and she stated:

Losing the children.  People were telling him things around the neighborhood and stuff that I was doing, because he was not allowed at the house from May.  They removed him from the house.  And people were telling him that I was doing stuff and that I was cheating on him with several different people.

September came along, and it was our daughter's birthday.  And we had talked on the phone.  We were both upset.  You know, the kids were gone, and we couldn't do anything.  And he had gotten drunk, and I don't know exactly how he got to the house.  And we ended up getting into an altercation.

And it was about - - he said I lost the kids and that it was my fault, and I tried to tell him that it's not just my fault.  And if I remember correctly the reason for them taking the children July 24th was Jaylene Fridell said that she had numerous anonymous phone calls saying that he had been staying at the house.

And he wasn't at all coming by the house or staying at the house.  He was doing what Judge Fisher ordered him to do.  He was staying away from the house.  So pretty much he was drunk and blaming me for them being removed.

* * *

He had just pushed me down, and I ran out of the house.  And he had put me in a sleeper hold, and I passed out.  And when I woke up from passing out, I ran to a neighbor's and hid.  And the cops were called, and he was arrested for public intoxication and I guess - - I don't know what it's called - - I guess abuse and I guess hitting me.  I don't know exactly how to say it.

Mother was asked about the incident in February of 2013, and she stated:

It was after our son's birthday, and pretty much the same thing as it was in September.  He had been drinking, thinking about not being able to be with me, not being able to hold and hug his children.  We were both upset about that.

-25-

And that night he had shoved me down on - - we were on the deck, and he had shoved me on the deck. And I got up and ran again. He put me in the sleeper hold and put me to sleep. And I got up, ran to the neighbor's, and again the cops were called.

With regard to the incident in June of 2013, Mother stated:

It was our son's birthday. My dad brought him for the birthday party. Everything went smoothly. My dad took him to wherever he was staying and dropped him off. I guess he got drunk where he was, and he had shown up drunk and saying things.

And I had locked myself and the children in the house, called my mom and my dad. They came to pick us up. And as we were loading the children into the car, he made verbal threats and stuff like that. . . . And I proceeded and got - - the children were already in the car. I got in the car, and my mom drove off.

Mother admitted that this last incident occurred four or five months prior to trial. Mother was asked if this last incident made her recognize that Father had not made enough progress for the Children to be safe, and she stated: "No. He was drunk, and he was upset." Mother was asked why she did not get an order of protection to protect her and the Children after this last incident, and she stated:

I don't know. I just didn't. I thought since he went to Bradford, he got help. I believed he was going to his classes and getting help. I just - - I really just - - I love him, and he loves me. And I have been going to my classes.

This Tuesday coming up is my last parenting class. I will be graduating that. I gave the letters to my lawyers. One is made out to Judge Fisher, and one is made out to Helen Burleson that I will have completed my parenting class.

When asked if she still believed that Father will change, Mother stated:

Yeah, I believe he will change. He's changed so far to me. There hasn't been any incident since - - there is no more verbal abuse. We look at the circle of violence and how co[-]dependency comes upon it, that I'm co[-]dependent upon him, which I am. He was taking care of everything and providing for everything.

Mother then was asked if that still was true, and she answered: "Today now? Yes."

Mother was asked about a letter dated June 27, 2012 that Mother wrote in order to obtain an order of protection against Father. Mother was shown the document, and she stated:

> Yes, I do remember this. And to be honest a lot of this that I did write is untrue. I was on medication and stuff. And I had talked to a friend, and she stated that if I wanted him to get the help he needed that DCS would do it.
>
> And most of this is untrue. And I'm sorry. I did lie to the Court when I wrote this. I just realized it made things worse. And since most of it wasn't true - - I had actually wrote two different things with a friend.
>
> And Lee Ann from Foothills read them both. And she took the one - - picked the one that I should turn in. And she just ripped the other one in half and threw it away.

Mother admitted that this letter stated that Father had flicked a lit cigarette in her face in front of the Children. She then stated:

> No, he never did that. Me and my girlfriend were sitting on my couch. That happened to her, and when that happened to her, she wrote it in her Order of Protection, and he got the help that he needed. So I thought it would do the same. Both her and I though it. Unfortunately it just made things worse. That was the one that I originally wrote for myself was the one that Lee Ann had tore up.

Mother also admitted that she had written that four months prior to the incident described above that Father had pushed her while she was holding one of the Children. At trial she stated: "He didn't push him down." Mother also admitted that she had written that Father chased her friend Jonathan, broke a bedroom door, opened his pants and exposed himself to Jonathan, and made a lewd statement and that this happened in front of two of the Children. Mother insisted that these things never happened. She stated: "[Father] and Jonathan were just messing around. They were actually just playing around. He did not break the door. Actually it was Jonathan who broke the door. It wasn't into pieces. It was just a clumsy door. It's a trailer door." Mother also admitted to writing that Father had pushed her in front of the Children. Mother was asked if Father had told her he would kill her, and she stated: "I can't recall. I don't remember him saying that in front of the children. . . . I don't remember putting it in the petition, but I'm sure it's in there if you say it is."

Mother admitted that she signed the document and had sworn that the information she had written was true. Mother also admitted that approximately a month later she had the order of protection dropped. Mother was asked why she requested that the order of protection be dropped, and she stated: "Because I knew that what I wrote was not true - - a lot of it was not true, and I dropped it because I realized I'd be perjuring myself if it went to Judge Layton's court. And I did not want to do that."

Mother was questioned further, and the following exchange occurred:

Q. I'm a little confused, and I want to give you the opportunity to help clarify for me. Your attorney was asking you questions about how you stood in front of children so that they wouldn't see someone who was exposing themselves. Do you recall that?

A. Yes.

Q. And who was the person exposing themselves?

A. [Father] and Jonathan.

Q. Okay. Didn't you testify when the guardian was asking you questions that that was something that you had made up and it had not happened?

A. I'm not sure if that was the one I said was made up. There was a lot of things that I lied about in that paperwork.

Q. Ma'am, isn't it fair to say that at this point you don't even remember what you lied about and what you haven't?

A. I don't know. To be honest, I've written stuff. I've said stuff. I've been under the influence of medications - - different medications that they were trying me on. And there is a lot of stuff I don't remember.

When questioned further about whether the incident actually had happened, Mother stated:

I walked out of the bedroom, and [Father] and Jonathan - - they weren't arguing, but they were laughing and joking around and stuff like that. And Jonathan had his pants opened, and I had said, "What are you doing?" And all of a sudden I see [Father] joking around saying, "Yeah. Well, I got this." And he just unbuttoned his pants, unzipped it, but he hadn't been exposed yet - - out

-28-

yet.

I don't know what you-all were doing. I really don't

But as soon as I saw what was happening, I just went, "No, stop this nonsense." And they were laughing and joking, playing around when and [sic] our daughter came out of her bedroom, wanted something for her - - wanted some milk for her sippy cup. And.

So I blocked [Father], and I said, "Zip up your pants right now. Whatever you two boys are doing you take it to a closed room, not where our kids could walk in." And they went to Jonathan's room and were continuing talking, listening to music in there.

Mother and Father were incarcerated in October for failure to pay child support. Mother testified that since then she had made a partial purge payment. Mother testified that she had paid some child support since the Children came into custody, but could not remember the last time she had paid. Mother stated: "I paid whatever I could, 100, $50. I paid $40 once, because that was all I had. Ms. Clark said she didn't care if it was five dollars, $10, as long as I was going in there and paying something." Mother was asked how much she was supposed to be paying and she stated: "I believe it's $40 per child, so 40 times three." Mother was not working at the time of trial. She stated that she planned to get the money to pay the next child support payment from her father. Mother testified that she did not have a job and did not voluntarily decide to not pay child support. Mother stipulated that she had been arrested on December 5, 2013 for driving on a revoked license.

Father testified that he missed visits in July and August of 2013 because he was working at TVA at Watauga Dam where he would stay for the week and come home on the weekends. Father's job involves painting. He testified that he had to obtain certification in "[a]erator, lifts, lead testing," and "get certified in certain paints and epoxies and stuff like that," in order to obtain the job. Father testified that he was with the painter's union and had been for four to six months.

Father does not have a driver's license, so he relies upon other people to transport him to work. Father was asked what steps he would need to take to get his license back, and he stated: "I got a DUI in Kentucky from almost ten years ago that I'd have to do, and that's it." Father testified that he has a car that runs, but is not insured because "we don't take it nowheres."

Father testified that he completed the NA class, but did not get a certificate.

He stated:

> 'Cause the NA class, it's required that you get - - go to five NA classes outside
> the - - the class itself, and - - and I had only gotten three or four of them done,
> so I lacked one or two of them classes due to my car tearing up and also being
> - - working at the same time. 'Cause there was a big conflict in the times that
> I had to be at work and the times I had to be at Bradford. So it was - - it was -
> - . . . .

Father stated:

> I have tried my best, and I'd like to continue trying, and I just can't lose my
> kids over something where I have tried. Everything that has been said, as far
> as like me throwing her over a banister, did not happen. I've done a lot of the
> classes, just no certificate. Just give me a chance.

Father was incarcerated at the time of trial. He stipulated that he was under
investigation on a felony charge. Father was asked what he was charged with, and he stated:
"I don't even know the charges. They're saying two different ones. One's a sexual battery,
and one's a - - it's just different. I really don't know." Father stated that the allegations were
"[t]hat I had touched some girl that was in my bed." Father refused to say who the girl was,
but answered that it was not a member of his family. Father was arrested on November 22,
2013 and had been incarcerated since that time. Father's bond was set for ten thousand
dollars, and Father stated he could not pay the bond. Father believed that his trial was set for
March of 2014.

Father was asked if he had complied with the requirements of the permanency
plan, and he stated:

> No, I haven't. I haven't fully finished everything that they wanted me to do.
> . . . I've tried everything that they wanted me to do. I - - I have went through
> Bradford, and I did think that the A and D assessments, and the mental
> assessments that I went through to get into those classes, and the batterers'
> intervention classes, I thought that those were acceptable to DCS, and - - and -
> - and it was - - and it wasn't to - - it wasn't to the extent that they wanted. So -
> - and I'm willing to go through another drug rehab, even though I have already
> went through one, and at this time I don't have no proof. But, I mean, if you-
> all really wanted to know on a truthful basis, there's a - - you can get on the
> phone and I will release whatever, and they can tell you right there, yes, I have
> completed the Bradford drug and alcohol assessment.

Father admitted that during the approximately year and a half since the Children were taken into State custody he has been incarcerated three times. Father stated:

I've only been drug tested through DCS just a - - just a couple of times there on that. I've - - I never really had a drug and alcohol problem as far as - - I did drink and - - and I - - and I have - - and I've decided now I - - I will never touch another drink in my life. But other than that, though, I don't do drugs.

Father was asked if he denied that domestic violence occurred between him and Mother, and he stated: "[i]n front of the kids, yes."

After trial the Juvenile Court entered its detailed Order Terminating Parental Rights and Final Decree of Complete Guardianship on February 19, 2014 finding and holding, *inter alia*:

For the reasons set forth below, based upon clear and convincing evidence, the Court concludes that the Petition filed by the Department is well taken, should be sustained, and the relief sought be granted. Accordingly, the Court concludes that the parental rights of [Mother] and [Father] to the children should be terminated and that such termination is in the children's best interest.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A. Findings of Fact:** As required by Tenn. Code Ann. §36-1-113(k), the Court makes the following findings of fact by clear and convincing evidence based on the testimony of witnesses, the exhibits presented during the trial of this cause, as well as the entire record in this action.

This Court has jurisdiction over this case pursuant to T.C.A. §§ 36-1-113, 37-1-104, and 37-1-147 and venue is properly in Anderson County pursuant to T.C.A. §§ 36-1-113(c)(4) and -114 and 37-1-111, in that the children are wards of the State of Tennessee Department of Children's Services, Anderson County Office.

Petitioner is the current custodian of the children. The children's mother is [Mother] and the children's father is [Father]. No other paternity claims or guardians exist.

The Court adjudicated the children dependent and neglected on

-31-

September 6, 2012, after issuing an emergency protective custody order placing the children in temporary state custody on July 27, 2012. The children have been in foster care continuously since the Court's protective custody order.

The children were removed from the parents' home based upon allegations of violation of the Court's no contact order, which disallowed contact between the father and children, and allegations of domestic violence between the parents and substance abuse by the parents.

At adjudication, the mother stipulated to dependency and neglect for her violation of the Court's no contact order; the father stipulated to dependency and neglect based upon both domestic violence between the parents and substance abuse.

Subsequent to the removal of the children, the Department made efforts that were above and beyond reasonable to assist the parents to be reunified with their children including providing services through the Foothills agency to work with the parents to prevent the children's removal in the first place; referring [Mother] to the Child Advocacy Center, which provides a program for domestic violence victims; contracting with ETHRA to transport [Mother] to the domestic violence classes every Thursday morning; paying the electric bill for [Mother] so that her electricity would not be disconnected; providing a list of alcohol/drug rehabilitation resources to [Father] and [Mother] and offering assistance with enrollment; referring [Father] to offender domestic violence classes; paying over $1,000.00 for [Father] to attend the domestic violence classes; providing drug screens to the parents; providing the parents with visitation with the children; referring the parents to medication management; providing ongoing case management; providing medical care and dental care for the children; providing ongoing advice and recommendations to the parents; providing daily care and support for the children; and developing a plan for reunification with the parents.

Despite these more than reasonable efforts by the Department, the parents failed to make similar reasonable efforts to be reunified with their children. [Father] has been arrested several times on various charges including domestic violence and rape of a minor. Both parents have failed drug screens and have failed to complete alcohol and drug abuse treatment. In short, neither parent has substantially complied with their requirements under the permanency plans and, although [Mother] made some progress, it was

-32-

superficial in that she has not internalized the skills and knowledge she gained - it has made no notable change to her behaviors or circumstances. The father has, as well, made no significant change to his behaviors of [sic] circumstances. Returning the children to the parents at this time would certainly cause the children to be further subjected to abuse or neglect and there is no indication that the parents will be willing or able to remedy their circumstances and conditions in a timely manner, if at all.

The children are in a safe and loving foster home. The children are bonded to their foster family and that bond is reciprocated. The children are thriving in this environment and would be harmed if removed from this environment.

**B. Conclusions of Law**: Under Tennessee law, termination of parental rights must be based on a finding by the court by clear and convincing evidence that (1) the grounds for termination of parental rights have been established; and (2) termination of the parent's or guardian's rights is in the best interest of the child. Tenn. Code Ann. §36-1-113(c).

Here, the Court concludes that there is clear and convincing evidence to support grounds for termination of [Mother's] and [Father's] parental rights under Tenn. Code Ann.§36-1-113(g). In addition, the Court concludes, based on clear and convincing evidence that termination of [Mother's] and [Father's] parental rights is in the children's best interest. Each ground is discussed in turn.

\* \* \*

## 3. SUBSTANTIAL NONCOMPLIANCE WITH PERMANENCY PLAN

In this case, pursuant to Tenn. Code Ann. §§36-1-113(g)(2) and 37-2-403(a)(2), the Court finds that there is clear and convincing evidence that despite more than reasonable efforts by the Department to assist them, as detailed above, the mother and father have willfully failed to substantially comply with their requirements under the permanency plan, designed to facilitate reunification of the children with them.

While the mother made more progress than the father in complying with the permanency plans' requirements, neither parent ever reached substantial compliance. Further, the mother's progress was nominal in that she failed to apply what knowledge she did obtain to change her behavior and

circumstances. As of the final date of trial on this matter neither parent had made sufficient progress on the permanency plans for the children to be safely returned to their custody. Neither parent was even close.

## 4. PERSISTENT CONDITIONS

In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(3), the Court finds that there is clear and convincing evidence that, , [sic] despite more than reasonable efforts by the Department to assist the parents, the conditions that necessitated removal persist and/or other conditions exist that make it unsafe for the children to be safely returned to the parents.

The parents' continued legal issues and their failure to resolve their drug and alcohol issues persist to this date and are the reasons, in part, that the children were removed from the parents' home. Given the extensive assistance given to the parents and the parents['] failure to make the necessary changes to these conditions there is no likelihood that the parents will remedy their conditions at an early date. Under these circumstances, continuation of the parent-child relationship greatly diminishes the children's changes [sic] of early integration into a safe, stable, and permanency [sic] home.

## 5. Best Interest

Under Tenn. Code Ann. §36-1-113(i)(1), the Court is required to find that termination of parental rights is in the child's best interest.

In this case, the Court finds that there is clear and convincing evidence that termination of [Mother's] and [Father's] parental rights is in the best interest of the children in that despite more than reasonable efforts by the Department to assist them, the parents have failed to make adjustments to their conduct, circumstances, and lifestyles that would make it safe for the children to return home; the children are bonded to their foster family and that bond is reciprocated, and a change of caretakers at this time would be harmful to the children; there is domestic violence and substance abuse is in the parents' home and the parents have exposed the children to both; the continued substance abuse by the parents makes them both consistently unable to care for the children in a safe and stable manner; and the foster family wishes to adopt the children and the children wish to be adopted.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED:**

That all of the parental rights of [Mother] and [Father] to [the Children]
be and the same are hereby forever terminated; . . . .

Mother and Father appeal the termination of their parental rights to this Court.

## **Discussion**

Although not stated exactly as such, Mother and Father raise four issues on
appeal: 1) whether the Juvenile Court erred in finding that DCS made reasonable efforts to
reunify Mother and Father with the Children; 2) whether the Juvenile Court erred in finding
that clear and convincing evidence was proven of grounds to terminate Mother's and Father's
parental rights for substantial noncompliance with the permanency plan pursuant to Tenn.
Code Ann. § 36-1-113(g)(2); 3) whether the Juvenile Court erred in finding that clear and
convincing evidence was proven of grounds to terminate Mother's and Father's parental
rights for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3); and, 4)
whether the Juvenile Court erred in finding and holding that it was in the Children's best
interest for Mother's and Father's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving
termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo*
> upon the record "accompanied by a presumption of the correctness of the
> finding, unless the preponderance of the evidence is otherwise." Tenn. R.
> App. P. 13(d). To terminate parental rights, a trial court must determine by
> clear and convincing evidence not only the existence of at least one of the
> statutory grounds for termination but also that termination is in the child's best
> interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code
> Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this
> Court's duty, then, is to determine whether the trial court's findings, made
> under a clear and convincing standard, are supported by a preponderance of the
> evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the
relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care,
> custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97

-35-

(Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We begin by addressing whether the Juvenile Court erred in finding that DCS made reasonable efforts to reunify Mother and Father with the Children. In *In re: Giorgianna H.*, this Court explained:

The reasonableness of the Department's efforts depends upon the circumstances of the particular case. The factors that courts use to determine the reasonableness of the Department's efforts include: (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re: Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006) (footnote omitted). "[T]he

Department's reunification efforts need not be 'herculean,'" and:

> The Department does not have the sole obligation to remedy the conditions that required the removal of children from their parents' custody. When reunification of the family is a goal, the parents share responsibility for addressing these conditions as well. Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required the Department to remove their children from their custody. *State Dep't of Children's Servs. v. B.B.M.*, 2004 WL 2607769, at *7; *In re C.M.M.*, 2004 WL 438326, at *7; *In re R.C.V.*, No. M2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002) (No Tenn. R. App. P. 11 application filed).

*Id.* (footnote omitted).

> With regard to this issue the Juvenile Court specifically found and held:

> Subsequent to the removal of the children, the Department made efforts that were above and beyond reasonable to assist the parents to be reunified with their children including providing services through the Foothills agency to work with the parents to prevent the children's removal in the first place; referring [Mother] to the Child Advocacy Center, which provides a program for domestic violence victims; contracting with ETHRA to transport [Mother] to the domestic violence classes every Thursday morning; paying the electric bill for [Mother] so that her electricity would not be disconnected; providing a list of alcohol/drug rehabilitation resources to [Father] and [Mother] and offering assistance with enrollment; referring [Father] to offender domestic violence classes; paying over $1,000.00 for [Father] to attend the domestic violence classes; providing drug screens to the parents; providing the parents with visitation with the children; referring the parents to medication management; providing ongoing case management; providing medical care and dental care for the children; providing ongoing advice and recommendations to the parents; providing daily care and support for the children; and developing a plan for reunification with the parents.

> Despite these more than reasonable efforts by the Department, the parents failed to make similar reasonable efforts to be reunified with their children. [Father] has been arrested several times on various charges including domestic violence and rape of a minor. Both parents have failed drug screens and have failed to complete alcohol and drug abuse treatment. In short, neither

parent has substantially complied with their requirements under the permanency plans and, although [Mother] made some progress, it was superficial in that she has not internalized the skills and knowledge she gained - it has made no notable change to her behaviors or circumstances. The father has, as well, made no significant change to his behaviors of [sic] circumstances.

The evidence in the record on appeal shows that DCS made efforts to assist both Mother and Father with addressing the issues of substance abuse and domestic violence that led to the Children being taken into State custody. Yet despite these efforts, Mother and Father persist in refusing to acknowledge that they have issues with substance abuse and domestic violence. DCS does not have the sole responsibility for remedying the conditions which led to the removal of the Children from Mother's and Father's custody, and the evidence in the record shows that Mother and Father refuse to take responsibility with regard to their issues. The evidence in the record on appeal, as discussed in detail above, does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's finding that DCS made reasonable efforts to reunify Mother and Father with the Children.

We next address whether the Juvenile Court erred in finding that clear and convincing evidence was proven of grounds to terminate Mother's and Father's parental rights for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2). In pertinent part, Tenn. Code Ann. § 36-1-113(g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

* * *

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2013).

Mother argues in her brief on appeal that she did substantially comply with the requirements of the Plan because she goes to Peninsula for medication management and, in addition to taking medication for her bipolar disorder, attends therapy, because she completed

parenting classes, and because she did attend domestic violence classes, among other things.

The evidence in the record on appeal, however, shows that Mother repeatedly tested positive for both illegal drugs and for prescription drugs for which Mother did not have a prescription. The evidence also shows that despite attending domestic violence classes, Mother has not been able to apply the information she claims to have learned in the classes. Mother's testimony with regard to the domestic violence is, at best, inconsistent from one day to the next. The evidence shows that Mother never has recognized the severity of the domestic violence that occurred in the parents' home. Mother herself testified to several incidents of domestic violence that occurred while the Children were in State custody including an incident that occurred between her and Father only four or five months prior to trial. Mother testified that each of these incidences occurred while Father was drinking or was drunk. Despite all of this, Mother persists in refusing to acknowledge that she and Father have an issue with domestic violence.

Father admitted at trial that he had not completed the requirements of the Plan. He also admitted that he has been incarcerated three times during the approximately year and a half since the Children were taken into State custody. Father denied that he has any problem with alcohol abuse, despite asserting that he had gone to Bradford and attended NA meetings. Father also denied that he and Mother have an issue with domestic violence. The evidence shows that Father, like Mother, never has recognized the severity of his alcohol abuse and the domestic violence that occurred in the parents' home.

The Juvenile Court found by clear and convincing evidence that, among other things:

> there is clear and convincing evidence that despite more than reasonable efforts by the Department to assist them, as detailed above, the mother and father have willfully failed to substantially comply with their requirements under the permanency plan, designed to facilitate reunification of the children with them.

> While the mother made more progress than the father in complying with the permanency plans' requirements, neither parent ever reached substantial compliance. Further, the mother's progress was nominal in that she failed to apply what knowledge she did obtain to change her behavior and circumstances. As of the final date of trial on this matter neither parent had made sufficient progress on the permanency plans for the children to be safely returned to their custody. Neither parent was even close.

The evidence in the record on appeal, as discussed in detail above, does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's finding that grounds were proven by clear and convincing evidence to terminate Mother's and Father's parental rights to the Children for substantial noncompliance with the permanency plan pursuant to Tenn. Code Ann. § 36-1-113(g)(2).

Next, we address whether the Juvenile Court erred in finding that clear and convincing evidence was proven of grounds to terminate Mother's and Father's parental rights for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). As pertinent, Tenn. Code Ann. § 36-1-113(g)(3) provides:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2013).

With regard to this issue, the Juvenile Court specifically found and held, *inter alia*:

> The parents' continued legal issues and their failure to resolve their drug and alcohol issues persist to this date and are the reasons, in part, that the children were removed from the parents' home. Given the extensive assistance given to the parents and the parents['] failure to make the necessary changes to these conditions there is no likelihood that the parents will remedy their conditions at an early date. Under these circumstances, continuation of the parent-child relationship greatly diminishes the children's changes [sic] of

-40-

early integration into a safe, stable, and permanency [sic] home.

The evidence in the record on appeal shows that the Children were removed from the parents' home due to allegations of substance abuse and domestic violence and were adjudicated dependent and neglected. The evidence in the record, as discussed in great detail above, further shows that both Mother and Father persist in denying that they have these issues and, thus, have made little or no progress toward resolving them. We need not reiterate all of the Juvenile Court's detailed and specific findings made by clear and convincing evidence relative to this ground, as they are quoted fully above. In short, the Juvenile Court found by clear and convincing evidence that the conditions which led to the Children's removal from Mother's and Father's home still persist and that there are other conditions which in all reasonable probability would cause the Children to be subjected to further abuse or neglect and which prevent the Children's safe return to Mother's and Father's care.

The evidence in the record on appeal does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's finding that grounds were proven by clear and convincing evidence to terminate Mother's and Father's parental rights to the Children for persistent conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

Finally, we consider whether the Juvenile Court erred in finding and holding that it was in the Children's best interest for Mother's and Father's parental rights to be terminated. When making a determination of whether terminating parental or guardianship rights is in the best interest of a child, a court is to consider the list of non-exclusive factors contained in Tenn. Code Ann. § 36-1-113(i).

The Juvenile Court considered all of the relevant factors including those listed in Tenn. Code Ann. § 36-1-113(i) and found that clear and convincing evidence existed that the termination of Mother's and Father's parental rights was in the best interest of the Children. We need not reiterate the Juvenile Court's detailed findings relative to this issue as they are quoted fully above. The evidence in the record on appeal does not preponderate against these findings made by the Juvenile Court by clear and convincing evidence. We find no error in the Juvenile Court's determination that terminating Mother's and Father's parental rights was in the best interest of the Children.

The Juvenile Court found that grounds to terminate Mother's and Father's parental rights had been proven by clear and convincing evidence and that it also had been proven by clear and convincing evidence that the termination was in the Children's best interest. The evidence in the record on appeal does not preponderate against these findings

made by the Juvenile Court by clear and convincing evidence. We, therefore, affirm the Juvenile Court's February 19, 2014 order terminating Mother's and Father's parental rights to the Children.

## **Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellants, Joann P.F. and Gary A.M.

_____
D. MICHAEL SWINEY, JUDGE